**R.H., a Public Official, Petitioner,**

v.

**STATE ETHICS COMMISSION, Respondent.**

**T.W., a Public Official, Petitioner,**

v.

**STATE ETHICS COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Aug. 22, 1995.

Decided March 18, 1996.

Evan E. Adair, for Petitioners.

Robin M. Hittie, Assistant Counsel, for Respondent.

Before DOYLE, PELLEGRINI and FRIEDMAN, JJ.

FRIEDMAN, Judge.

R.H. and T.W. (together, Petitioners) appeal from orders of the State Ethics Commission (SEC) concluding that Petitioners violated section 3(a) of the State Ethics Law of 1978 (1978 Act).[1] Petitioners also appeal from the SEC's order directing R.H. and T.W. to pay $11,246.01 and $4,583.37, respectively, in restitution for private pecuniary benefits received in violation of section 3(a) of the State Ethics Law of 1989 (1989 Act).[2]

██ This case is governed by both the 1978 Act and the 1989 Act.[3] However, the 1989 amendments are not retroactively applicable,[4] *Department of Commerce v. Casey,*

---

**1.** Act of October 4, 1978, P.L. 883, which provided in relevant part:

> No public official or public employee shall use his public office ... to obtain financial gain other than compensation provided by law....

"Compensation" was defined in section 2 of the 1978 Act as:

> Anything of economic value, however designated, which is paid ... for or in consideration of personal services to any person, official or the capital estate.

**2.** The 1978 Act was subsequently amended and reenacted and is now found at Act of June 26, 1989, P.L. 26, 65 P.S. §§ 401–413. The amended version of section 3(a) provides in relevant part:

> No public official or public employee shall engage in conduct that constitutes a conflict of interest.

65 P.S. § 403(a). "Conflict of interest" is defined in the 1989 Act as:

> Use by a public official ... of the authority of his office or employment ... for the private pecuniary benefit of himself....

65 P.S. § 402.

**3.** The later Act is much more specific than its predecessor and imposes stricter requirements upon both public officers and the SEC. For example, the 1989 Act significantly modified the way in which investigations into ethical violations take place, requiring the SEC to follow a specific timetable established in section 8 of the 1989 Act, 65 P.S. § 408.

Another notable difference is that the 1989 Act, unlike the 1978 Act, allows the SEC to impose the remedy of restitution for violations:

> Any order resulting from a finding that a public official or public employee has obtained a financial gain in violation of this act may require the restitution plus interest of that gain to the appropriate governmental body.

Section 7(13) of the 1989 Act, 65 P.S. § 407(13).

**4.** The 1989 Act is very specific on this point:

> *This amendatory act shall not apply to violations committed prior to the effective date of this act, and causes of action initiated for such violations shall be governed by the prior law,* which is continued in effect for that purpose as if this act were not in force. For the purposes of this section, a violation was committed prior to the effective date of this act if any elements of the violation occurred prior thereto.

Section 9 of the Act of June 26, 1989, P.L. 26, (emphasis added).

154 Pa.Cmwlth. 505, 624 A.2d 247 (1993); therefore, for alleged violations committed prior to the enactment of the 1989 Act, the SEC must investigate under the 1978 Act provisions. Accordingly, we disagree with Petitioners' argument that, because the SEC did not begin its investigation until after the effective date of the 1989 Act, the stricter provisions of that Act should apply to all alleged violations considered here. Application of the 1989 Act is specifically limited to violations committed after its enactment. Consequently, the SEC properly applied the 1978 Act standards to its investigation of Petitioners' alleged violations occurring prior to enactment of the 1989 Act.[5]

This case presents a complicated, lengthy pattern of facts which stretch out over a period of at least six years, during which time Petitioners were Supervisors of Summit Township (Township).[6] Petitioners received compensation for these positions as set by ordinance. Moreover, in each year from 1988 to 1994, Petitioners, as Supervisors, appointed themselves to the positions of roadmasters and notified the Township Auditors of these appointments.[7] Petitioners also served as laborers during each of these years.

### 1988–1989

In January 1988, the Township Auditors set a flat annual salary of $5,420 to be paid to roadmasters and an hourly wage of $8 for roadmasters working as laborers,[8] and the Supervisors authorized Petitioners' attend-

---

5. We note that the SEC applied the 1978 Act standards to each alleged violation which occurred during 1989 because, although the actual actions might have occurred after enactment of the 1989 Act, the decisions which authorized such actions had been made at the start of the year, before enactment of the 1989 Act. (R.R. at 63b and 131b.)

6. At all relevant times, there were three Supervisors in office; however, actions of the other Supervisors are not in question here. Under section 516 of the Second Class Township Code (Code), Act of May 1, 1933, P.L. 103, *as amended*, 53 P.S. §§ 65101–67201, the pertinent duties of township supervisors, or the supervisors employed as superintendents and roadmasters, are:

> (a) Have the general care and superintendence of the improvement of the roads and bridges in the township. . . .
> (b) Cause such roads and bridges to be kept in repair. . . .
> (c) Inspect all roads and bridges. . . .
> . . . .
> (e) Employ or hire such persons, as may be necessary for the general conduct of the business of the township, and provide for the organization and supervision of the persons so employed, and work on the roads themselves when directed to do so by the board of supervisors.
> (f) Construct and keep in repair all sluices and culverts, and keep the waterways, bridges and culverts open.
> (g) Cause loose stones lying in the beaten track of every road to be removed. . . .
> (h) Attend meetings and conventions if directed to do so by the board of supervisors. . . . The expenses for attending the conferences . . . may be paid by the township and shall be limited to the registration fee, mileage . . ., or reimbursement of actual transportation expense . . . plus all other actual expenses that

the township board of supervisors may have agreed to pay. . . . The township board of supervisors may authorize township employees to be compensated at their regular employe rate during their attendance at the meeting. 53 P.S. § 65516.

7. In *Yocabet v. Commonwealth, State Ethics Commission*, 109 Pa.Cmwlth. 432, 531 A.2d 536 (1987), we held that sections 514, 53 P.S. § 65514, and 515, 53 P.S. § 65515, of the Code permit township supervisors to appoint themselves to township offices of roadmaster, secretary and treasurer; however, Code sections 515 and 531, 53 P.S. § 65531, require township auditors to set the compensation for these offices. The purpose behind requiring township auditors to set the compensation for supervisors working as roadmasters is to prevent supervisors from *enriching themselves at county expense by setting their own salaries as roadmasters*. *Synoski v. Hazle Township*, 93 Pa.Cmwlth. 168, 500 A.2d 1282 (Pa.Cmwlth.1985).

The compensation of supervisors is set by section 515 of the Code, 53 P.S. § 65515, which provides in relevant part:
> The compensation of supervisors, when acting as superintendents, roadmasters or laborers, shall be fixed by the township auditors either per hour, per day, per week, semi-monthly or monthly, which compensation shall not exceed compensation paid in the locality for similar services . . . but no supervisor shall receive compensation as a superintendent or roadmaster for any time he spends attending a meeting of supervisors.

53 P.S. § 65515.

8. The wage of $8/hour for roadmasters working as laborers was reached by averaging the bottom four wages of Township employees and then rounding to the nearest dollar.

ance at the 1988 convention of the Pennsylvania State Association of Township Supervisors (PSATS), for which Petitioners received compensation of $8 per hour for time spent at the convention. At a Supervisors' meeting in February 1988, the Supervisors hired T.W. as a full-time laborer and R.H. as a part-time laborer.

At the Township Auditors' meeting in early 1989, the Auditors reduced the hourly wage rate for Supervisors working as laborers from $8 to $5, while retaining the roadmasters' salary at $5,420. A few days later at a special meeting, the Supervisors voted unanimously to challenge the Auditors' wage reduction and, to that end, authorized the Township Solicitor to initiate legal action against the Auditors. Also in January 1989, the Supervisors authorized Petitioners' attendance at the 1989 PSATS convention for which Petitioners received payment at the rate of $5 per hour.

On January 20, 1989, a complaint was filed with the SEC alleging that Petitioners had violated the 1978 Act by: (1) authorizing the Township Solicitor to pursue the suit against the Township Auditors for their own personal gain; and (2) receiving both an annual roadmaster salary and an hourly laborer wage for the same work. (R.R. at 5a and 13a.) In October 1989, pursuant to section 8 of the 1978 Act,[9] the SEC decided to conduct a preliminary inquiry into the allegations made in the complaint. Mary Albert (Albert) of the investigative division of the SEC was assigned to the matter and began her investigation by December 21, 1989.

On December 29, 1989, the Erie County Court of Common Pleas ruled on the Supervisors' suit against the Township Auditors and set the hourly wages for Supervisors working as roadmasters at $11.50 for full-time work and $8.50 for part-time work.[10]

### 1990–1994

On January 26, 1990, after the Township Auditors instituted the new wage rates pursuant to the court's order, the Supervisors held a meeting at which they voted to pursue an appeal of the December 29, 1989 order through the Township Solicitor on the issue of retroactive pay in the event a meeting with the auditors to resolve the issue proved fruitless. At the meeting, the Supervisors also authorized Petitioners' attendance at the 1990 PSATS convention.

In August 1990, based upon Township records, Albert recommended a full investigation into possible Ethics Act violations by Petitioners. The SEC's executive director notified Petitioners by letter dated August 31, 1990 that their conduct might have violated the 1978 Act; no mention was made of any possible violations of the 1989 Act at this time. Albert continued her investigation in 1991 and 1992 by requesting more information from the Township and interviewing Township employees.

In November 1993, the SEC's executive director contacted Petitioners for the first time since August of 1990. In that notice, the director informed Petitioners that, in addition to the alleged violations of the 1978 Act, they also were being investigated re-

---

9. Section 8 of the 1978 Act provided in pertinent part:

> (a) Upon a complaint ... the commission shall investigate any alleged violation of this act.... The executive director shall notify any person under investigation by the commission of the investigation and of the nature of the alleged violation within five days of the commencement of the investigation.
> (b) If a preliminary investigation fails to indicate probable cause for belief that this act has been violated, the commission shall terminate the investigation and so notify the complainant and the person who had been under investigation.

65 P.S. § 408.

10. From the court's opinion:

> [I]t appears that certain supervisors/roadmasters have used their authority as supervisors to set their own compensation....
> This point of contention between the parties can be easily eliminated by precluding a dual compensation system. The code does not visualize a compensation system of a flat part-time salary supplemented by an hourly rate for road work.
> . . . .
> [T]his Court concludes that an hourly rate is more appropriately set for both a full-time roadmaster and a part-time roadmaster.

(R.R. at 75a.)

Apparently, the hourly roadmaster rate ultimately became the hourly rate for all supervisors working as laborers.

garding alleged violations of the 1989 Act. This was Petitioners' first notice regarding potential 1989 Act violations.

On January 11, 1994, the SEC issued investigative complaints against Petitioners which alleged violations of the 1978 Act. Two months later, the SEC amended the complaints to include alleged 1989 Act violations. On June 30, 1994, following a hearing on the complaints, the SEC concluded that Petitioners had committed violations of the 1978 Act by:

(1) Receiving hourly wages for work included within the annual roadmaster salary.

(2) Receiving overtime wages not authorized by the Township Auditors.

(3) Receiving hourly wages for attending PSATS conventions in 1988 and 1989.

(4) Retaining the Township Solicitor in the statutory appeal from the Auditors' 1989 award of compensation.

(5) And, as to T.W., receiving hourly wages for performing duties within those of an elected Supervisor.

The SEC further concluded that each Petitioner had committed violations of the 1989 Act by:

(1) Receiving overtime wages not authorized by the Township Auditors.

(2) Retaining the Township Solicitor in the appeal from the litigation against the Township Auditors.

(3) Receiving compensation for performing duties within those of an elected Supervisor.

Pursuant to the 1989 Act, the SEC ordered R.H. to pay restitution of $11,246.01 and ordered T.W. to pay restitution of $4,583.37.

On appeal,[11] Petitioners argue that the SEC's determination that Petitioners violated the 1978 Act was not supported by substantial evidence. Petitioners argue further that the SEC's determination that Petitioners violated the 1989 Act must be dismissed because the SEC did not initiate, conduct or conclude its investigation of those violations in accordance with the 1989 Act provisions.[12]

**A. Whether there was substantial evidence to support the SEC's determination that Petitioners violated the 1978 Act by:**

**1. Receiving hourly wages for work included within the annual roadmaster salary.**

In 1988 and 1989, the annual roadmaster salary was $5,420.00. The laborer rate in 1988 was $8.00/hour, but was reduced to $5.00/hour in 1989. For those two years, the SEC found that, in some instances, Petitioners received compensation as a laborer for road-related work already included in their roadmaster salaries.[13] Thus, the SEC concluded that Petitioners violated section 3(a) of the 1978 Act because their double payment was financial gain other than compensation provided by law.

Petitioners argue that the SEC erred in reaching this conclusion because the roadmaster salary does not contemplate any actual physical labor. We disagree. Section 516 of the Code, 53 P.S. § 65516, clearly provides that supervisors working as roadmasters must work on the roads themselves when necessary and perform other prescribed physical labors necessary to maintain safe conditions within the township. After careful review of the record, particularly the time-

11. Our scope of review on decisions of the SEC is limited to determining whether necessary factual findings are supported by substantial evidence, an error of law has been committed or constitutional rights have been violated. *Yocabet v. Commonwealth, State Ethics Commission*, 109 Pa.Cmwlth. 432, 531 A.2d 536 (1987). Substantial evidence is such evidence that a reasonable person would consider adequate to support the finding. *Id.*

12. Alternatively, Petitioners assert that, even if the SEC properly conducted the investigation

into Petitioners' alleged 1989 Act violations, the SEC determinations regarding the alleged 1989 Act violations were not supported by substantial evidence. Because we conclude that the SEC did not conduct its investigation into the alleged 1989 Act violations in accordance with the provisions of that Act, we need not address this alternative argument.

13. The amount of double compensation received in 1988 and 1989 by R.H. and T.W., respectively, was $307.30 and $735.70.

sheets submitted by Petitioners, we conclude that Petitioners billed the Township as laborers for activities contemplated by statute to be within the duties of a roadmaster.

### 2. Receiving pay at overtime rates which were not authorized by the Township Auditors.

According to the SEC, Petitioners violated section 3(a) of the 1978 Act by receiving improper overtime pay in 1988 and 1989 [14] because the Township Auditors had not specifically authorized an overtime rate as part of Petitioners' compensation, as required by section 515(a) of the Code, 53 P.S. § 65515(a).

■ Petitioners, however, argue that section 515(a) of the Code, 53 P.S. § 65515(a), requires that the Township Auditors set the compensation of Supervisors employed as laborers, but does not require the Township Auditors to specifically provide an overtime rate in addition to the compensation. Because the overtime wages Petitioners received were paid to them under the same circumstances and at the same rate as paid to all other Township employees, and because the final overtime rate was calculated by applying the statutory overtime rate of 150% to the compensation actually set by the Township Auditors, Petitioners assert that the overtime wages they received were not, in fact, financial gain other than compensation provided by law. We agree.

Although section 5(a)(12) of the Minimum Wage Act of 1968 (Minimum Wage Act) [15] exempts supervisors from statutory overtime for performance of their *supervisory duties*, section 4(c) of the Minimum Wage Act, 43 P.S. § 333.104(c), provides statutory overtime for supervisors employed by a township as laborers: "[e]mployes shall be paid for overtime not less than one and one-half times the employe's regular rate...."

We addressed this same issue in *Uremovich v. State Ethics Commission*, 129 Pa. Cmwlth. 549, 566 A.2d 375 (1989), in which we declined to treat supervisor/employees differently from ordinary employees for overtime purposes. In *Uremovich*, we held that the supervisors did not violate the 1978 Act by receiving overtime wages for work performed as laborers even though the township auditors had not specifically authorized the overtime wages.

Likewise, we hold here that, although the Township Auditors had not set an overtime rate specifically for supervisors working as laborers in 1988 and 1989, Petitioners did not violate section 3(a) of the 1978 Act by receiving overtime for their work as laborers at a rate equal to that paid to all hourly-wage Township employees.

### 3. Receiving compensation at hourly rates for attending PSATS conventions in 1988 and 1989.

■ The SEC further found that Petitioners violated section 3(a) of the 1978 Act in 1988 and 1989 when they were doubly compensated for attending the PSATS conventions.[16] The SEC reasoned that, because attending the conventions was included within Petitioners' duties as roadmasters, these payments amounted to dual compensation because Petitioners received their annual salaries as roadmasters, plus hourly wages for time spent at the convention. Therefore, Petitioners' receipt of hourly wages was compensation other than that authorized by law.

Petitioners counter that attendance at the PSATS conventions was outside the scope of being a Supervisor and/or roadmaster. However, because attendance at such conventions is one of the duties of Supervisor/roadmasters specifically enumerated in section 516 of the Code, 53 P.S. § 65516, this argument must fail.

### 4. Retaining the Township Solicitor to represent them in the suit against the Township Auditors.

■ The SEC concluded that Petitioners violated section 3(a) of the 1978 Act by using

---

14. In 1988 and 1989, R.H. received $96.15 in overtime pay and T.W. received $182.55.

15. Act of January 17, 1968, P.L. 11, *as amended*, 43 P.S. § 333.105(a)(12).

16. R.H. received $376.00 and T.W. received $312.00 in hourly wages for attending the PSATS conventions.

the Township Solicitor, at Township expense, to challenge the Auditors' 1989 decision to decrease the annual laborer wage for Supervisors working as laborers.[17] The SEC reasoned that, because the suit was not brought by Petitioners in their capacity as elected public officials but, rather, as private employees, such action amounted to a use of office for the purposes of obtaining financial gain other than compensation provided by law. The SEC did not dispute Petitioners' right to challenge the wage decrease as individuals, but the SEC found that Petitioners' use of Township funds to do so contravened section 3(a) of the 1978 Act.

Petitioners argue that their appeal was not private in nature but was, rather, within their duties as Township Supervisors, and thus, did not violate the 1978 Act. In support of this position, Petitioners rely upon *Auditor's Report of McKean Township for 1984*, 110 Pa.Cmwlth. 68, 531 A.2d 879 (1987), for the proposition that section 553 of the Code, 53 P.S. § 65553, entitles a township supervisor to assert his or her statutory rights and challenge an auditor's compensation decision. Even if *McKean* stands for such a proposition, and we do not agree that it does, *McKean* does not help Petitioners here. Section 553 of the Code, 53 P.S. § 65553, merely allows for appeals from auditors' reports; it does not authorize payment for such appeals from township funds. Moreover, section 563 of the Code, 53 P.S. § 65563, only grants reimbursement, not prepayment, of counsel fees, and then only in the event an appeal under section 553 of the Code is successful, which was not the case here.

Section 516 of the Code, 53 P.S. § 65516, which· provides that supervisors' duties include hiring such persons as may be necessary for the general conduct of the business of the township, allows supervisors to retain the township solicitor to represent the township. However, we must agree with the SEC that the benefits Petitioners sought through the suit against the Township Auditors were personal to the Petitioners and not necessary for the general conduct of business of the Township. Therefore, the value of the legal representation Petitioners received from the Township Solicitor was financial gain other than compensation provided by law, in violation of the 1978 Act.

### 5. Receiving hourly wages for performing Supervisor duties.

The SEC determined that T.W.[18] violated section 3(a) of the 1978 Act by receiving hourly compensation as a laborer for performing administrative functions in 1988 and 1989 that fell within his duties as an elected Supervisor.

■ T.W. maintains that he is entitled to hourly wages for performing these duties. He notes that the recent growth of the Township led to a substantial increase in demands upon the Township government and that the Supervisors have assumed responsibility for meeting much of this burden. With this argument, T.W. implies that, because the rise in activity forced him to work in excess of the stated duties of Township Supervisors, he was properly compensated for such actions with an hourly wage.

We sympathize with T.W.; however, there is no question that the duties at issue were supervisory in nature. The supervisory salary was statutorily set and encompassed all of the ensuing administrative functions. Thus, T.W. violated the 1978 Act when, in addition to his Supervisor's compensation, he received hourly wages as an employee for performing administrative duties.

Having reviewed Petitioners' arguments against all five of the SEC's bases for determining that Petitioners violated section 3(a) of the 1978 Act, we conclude that the SEC's determination was supported by substantial evidence in each case, except on the issue of overtime. Accordingly, we affirm the SEC's determinations that Petitioners violated section 3(a) of the 1978 Act by receiving hourly wages for work included within the annual

---

**17.** Not including the cost of appealing the court's decision, the cost to the township of the litigation was $7,341.03.

**18.** Because each of R.H.'s alleged violations occurred after enactment of the 1989 Act, only T.W. was found to have violated the 1978 Act in this way.

roadmaster salary, receiving compensation at hourly rates for attending PSATS conventions in 1988 and 1989, retaining the Township Solicitor to represent them in the suit against the Township Auditors and receiving hourly wages for performing Supervisor duties. We reverse, however, the SEC's determination that Petitioners violated section 3(a) of the 1978 Act by receiving pay at overtime rates which were not authorized by the Township Auditors.

**B. Whether the SEC properly initiated, conducted and concluded its investigation into violations of the 1989 Act.**

As previously noted, the 1989 Act requires the SEC to follow established guidelines and timetables for conducting investigations into alleged violations of the Ethics Act. Petitioners argue that the SEC did not follow these prescribed procedures in its investigation of Petitioners' alleged violations of the 1989 Act. We agree.

Section 8 of the 1989 Act, 65 P.S. § 408 (emphasis added), provides in relevant part:

(a) Upon a complaint ..., the commission, through its executive director, shall conduct a preliminary inquiry into any alleged violation of this act.... The commission shall complete its preliminary inquiry within 60 days of its initiation.

(b) If a preliminary inquiry fails to establish reason to believe that this act has been violated, the commission shall terminate the inquiry and so notify the complainant and the person who had been the subject of the inquiry.

(c) If a preliminary inquiry establishes reason to believe that this act has been violated, the commission may, through its executive director, initiate an investigation to determine if there has been a violation.... *No investigation may be commenced until the person who is the subject of the investigation has been notified and provided a general statement of the alleged violation* or violations of the act and other applicable statutes with respect to such investigation.... *The commission shall notify the complainant within 72 hours of the commencement of an investigation, and thereafter, the commission shall ad-*

*vise the complainant and the person who is the subject of the investigation of the status of the investigation at least every 90 days until the investigation is terminated. The commission shall, within 180 days of the initiation of an investigation, either terminate the investigation ... or issue a findings report....* Upon a showing by the executive director of the need for extension of this period, the commission may extend an investigation for up to two 90–day periods, provided that each 90–day extension shall be approved by a majority vote of members present. *In no event shall a findings report be issued later than 360 days after initiation of an investigation.*

. . . .

(e) The commission, upon the completion of an investigation, shall issue a findings report to the subject of the investigation setting forth the pertinent findings of fact.

The SEC failed to comply with several of these requirements.

 First, the 1989 Act requires the SEC to notify subjects of investigations prior to commencement of such investigation. Although Petitioners received notice on August 31, 1990 that they were the subjects of a full investigation into alleged violations of the 1978 Act, the SEC failed to notify Petitioners of the 1989 investigation until November 1993, almost three and a half years after first receiving evidence of 1989 Act violations.

Moreover, we are unpersuaded by the SEC's claim it did not *officially* begin its investigation into the 1989 Act violations until September 15, 1993 and thereby followed the correct procedures by notifying Petitioners on November 10, 1993 and issuing a findings report on January 11, 1994. The record shows that on May 11, 1990, Albert was provided with Township records containing documentation which later became part of the supporting evidence for the SEC's conclusion that Petitioners had violated the 1989 Act. By the time the SEC "officially" began the 1989 Act investigations on September 15, 1993, the overall investigation had been going on for nearly four years and

Petitioners had been engaging in conduct allegedly violative of the 1989 Act during the entire pendency of the investigation. The record shows sufficient investigation in the years after enactment of the 1989 Act and before September 15, 1993 that it cannot be said that the 1989 Act investigations began on September 15, 1993, even though the focus may have drastically shifted as of that date from 1978 Act violations to the 1989 Act violations.

■■■ Second, the 1989 Act specifically requires that the SEC shall update the subject of an investigation regarding the status of such investigation at least every 90 days until the investigation is terminated or concluded. Between May 1990, when the 1989 Act investigations began, and March 1994, when all investigations terminated, Petitioners received no updates from the SEC regarding the status of the investigation.

■■■ Third, the 1989 Act directs that within 180 days of the initiation of an investigation, the SEC must either terminate the investigation or issue a findings report. Although two 90–day extensions are allowed, "in no event shall a findings report be issued later than 360 days after initiation of an investigation." 65 P.S. § 408(c). Here, the SEC issued its findings report on the 1989 Act violations in March 1994. Although the SEC argues that it began the 1989 Act investigation no earlier than September 1993, the evidence demonstrates that the SEC initiated this investigation prior to March 1993. Therefore, the SEC failed to comply with the 1989 Act requirement that the findings report be issued within 360 days after the start of an investigation.

Accordingly, because the Commission failed to comply with the 1989 Act's strict investigation provisions, we reverse the SEC's determinations, based upon evidence adduced through the untimely investigation, that Petitioners violated section 3(a) of the 1989 Act.

**1.** Act of October 4, 1978, P.L. 883, which was amended and reenacted and is now found at Act

*ORDER*

AND NOW, this 18th day of March, 1996, in accordance with the foregoing opinion, the orders of the State Ethics Commission, dated June 30, 1994, are affirmed in part and reversed in part.

PELLEGRINI, Judge, concurring and dissenting.

While I join with other portions of the majority's opinion, I dissent from Part Four's finding that the Petitioners violated the Ethics Act [1] by authorizing the Township Solicitor to challenge the Auditors' decision to decrease the annual laborer wage for Supervisors working as laborers.

The Petitioners were Township Supervisors for which they received compensation as set by ordinance. From 1988 to 1994, the Petitioners, as Supervisors, appointed themselves to positions of roadmasters as specifically authorized by Section 514 of the Second Class Township Code, 53 P.S. § 65514. Section 514 provides in relevant part:

> The board of township supervisors ... shall employ a superintendent for the entire township or a roadmaster for each district ... The supervisors shall fix the wages to be paid ... to the superintendent or roadmasters and laborers for work on the roads and bridges ... *This section shall not prohibit the township supervisors from being employed as superintendents or roadmasters, or as laborers, if physically able to work on and maintain the roads.* (Emphasis added).

Where supervisors appoint themselves to positions of roadmasters, it is the responsibility of the Township's Auditors to set their compensation. 53 P.S. §§ 65515 and 53 P.S. § 65531; *Yocabet v. Commonwealth, State Ethics Commission*, 109 Pa.Cmwlth. 432, 531 A.2d 536 (1987). In January of 1988, the Township Auditors set a flat annual salary of $5,420 to be paid to the roadmasters and an hourly wage of $8 for roadmasters working as laborers. At their meeting in early 1989, the Township Auditors reduced the hourly

of June 26, 1989, P.L. 26, 65 P.S. §§ 401–413.

wage rate for Supervisors working as laborers from $8 to $5, while retaining the annual roadmaster's salary at $5,420.

At a special meeting of the Board of Supervisors, the Supervisors unanimously voted to authorize the Township Solicitor to challenge the Auditors' reduction in the wage rate of Supervisors working as laborers. This appeal was authorized by 53 P.S. § 65553 (Section 553 of the Second Class Township Code), which provides:

> The township, or any registered elector or taxpayer thereof on its behalf, or any officer whose account is settled or audited by the township auditors, may appeal from any settlement or audit of the township auditors to the court of common pleas within forty-five days after the settlement has been filed in the court of quarter sessions.

The trial court set the hourly wages for Supervisors working as roadmasters at $11.50 for full-time employees and $8.50 for part-time employees, and ordered the Auditors to institute the new wage rates. After the Auditors instituted the new wage rates pursuant to that order, the Board of Supervisors voted to pursue an appeal of the trial court's order, once again through the Township Solicitor, on the issue of retroactive pay if the meeting with the Auditors to resolve the issue proved fruitless.

In January of 1994, the State Ethics Commission (SEC) issued investigative complaints against the Petitioners alleging violations of the Ethics Act. Besides the other matters mentioned in the majority's opinion, the SEC found that the Petitioners violated the Ethics Act by authorizing the Township Solicitor in the statutory appeal from the Auditors' 1989 award of compensation and in retaining the Township Solicitor in the appeal from the litigation against the Township Auditors.

I disagree with the majority that the Petitioners' use of the Township Solicitor to pursue their statutory appeal from the Auditors' report was a violation of Section 3(a) of the Ethics Act of 1978, constituting the use of public office by public officials for financial gain other than compensation provided by law. There would be no doubt if the Super-

visors voted to appeal a decision of the Auditors involving others, that would in no way constitute a violation of the Ethics Act because there would not be any potential financial gain on their part if the Township Solicitor was successful. What the majority and the SEC erroneously focus on is the dual role of the Petitioners, as both Supervisors and roadmasters or laborers. Because of that dual role, their vote as members of the Board of Supervisors authorizing the Township, through the Township Solicitor, to appeal the Auditors' ruling, constituted the use of public office for public gain because, as either roadmaster or laborer, their salary could be increased. What is missing from that analysis is that this dual role is specifically authorized by the Second Class Township Code (Code).

Section 514 of the Code specifically permits the Board of Supervisors, on behalf of the Township, to appoint Supervisors to serve as roadmasters or laborers. While the SEC may consider that a use of public office for private financial gain, that cannot be a conflict or a violation of the Ethics Act because it is specifically authorized by the Code. Correspondingly, because Section 553 of the Code specifically provides that the Township has the right to appeal the Auditors' decision as to the rate of pay of roadmasters and laborers, that also cannot be considered a violation of the Ethics Act. Even though the litigation was authorized by the individuals who would ultimately benefit, nonetheless, because the holding of the dual office was sanctioned by the Code, there was no conflict when the Board of Supervisors directed the Township Solicitor to take the appeal. Accordingly, I dissent to that portion of the majority's opinion which holds that the Petitioners' use of the Township Solicitor, in accordance with their obligations and statutory rights, was a violation of the Ethics Act.